## CITY OF NEW ORLEANS *v.* MRS. GRAIHLE.

The city of New Orleans has the right to sue for the tax imposed under the city ordinance passed in conformity with the Act of the Legislature, of the 12th of March, 1852.

The provision of the Constitution of 1845, which forbids the State to subscribe to the stock of any corporation, or joint stock company, does not extend to such subscriptions by municipal corporations,

Decision in *Police Jury* v. *McDonogh's Succession*, 8 Ann., affirmed.

The case of the *Police Jury* v. *McDonogh's Succession*, was elaborately argued and carefully considered, and (by *Slidell*, C. J.) upon the faith of that decision we may reasonably presume that manifold contracts have been entered into, and large advances of money made, the railroad enterprises then initiated being of great magnitude. To overthrow the decision of a question of such moment would involve a responsibility most grave, and which a court of justice should not assume without the most clear and unqualified conviction that its former conclusion was erroneous. A vacillating jurisprudence in a grievous evil. It would be, especially deplorable with regard to constitutional questions embracing a wide practical range.

NEW ORLEANS    Article 121 of the Constitution of 1845, which provides that " the State shall not become a subscri-
v.             ber to the stock of any corporation, or joint stock company," takes from the Legislature all
GRAIHLE.       power to authorize a subscription by a municipal corporation to a corporation or joint stock com-
               pany. *Buchanan*, J., dissenting.
               As the municipal corporation is the creature of the Legislature, so is the Legislature, in its turn,
               nothing but the creature of the will of the people, as expressed by the Constitution. When that
               will has imposed a restriction upon the legislative action in any particular direction, the power to
               legislate in that direction not existing, any attempted delegation to a corporation of a power of
               that nature is a manifest evasion of the Constitution, and an usurpation of the most dangerous
               kind. *Buchanan*, J., dissenting.
               The Statute of 13th of March, 1852, is general, and applies to every police jury and every munici-
               pal corporation in the State. Now, it is belived, that every foot of ground in Louisiana, is within
               the territorial jurisdiction of some police jury, or some municipal corporation. Therefore, the
               statute has an operation co-extensive with the State, and is, in substance, though not in sem-
               blance, a statute to authorize the whole State to become subscriber to the stock of corporations.
               *Buchanon*, J., dissenting.
               The violation of Article 121 of the Constitution, would not be less real, although it would not be so
               palpable, had the statute authorized but one subscription by one municipal corporation or police
               jury. The nullity, the radical vice of want of authority in the party authorizing the subscription,
               would have equally existed in the case supposed. *Buchanan*, J., dissenting.
               That which the Legislature cannot do constitutionally itself, it cannot constitutionally authorize a
               municipal corporation to do. *Buchanan*, J., dissenting.
               The Act of 15th of March, 1854, authorizes the city of New Orleans to subscribe to the stock of cer-
               tain railroad companies, directly, in lieu of the tax convertible into stock by the tax payer, im-
               posed by the ordinance passed under the provision of the Act of 12th of March, 1852. The Act
               requires the council, under certain conditions, to repeal the ordinance—but contains the following
               *proviso:* " Provided the repeal of said ordinance shall not be so construed as to relieve the city
               from its liability to collect and pay over to said railroad company, that portion of the railroad tax
               imposed under said ordinance, for the year 1853, which has not yet been collected and paid over to
               said company." *By the Court:* This proviso immediately follows a peremptory requirement by
               the Legislature, of a repeal of the ordinances of the 13th and 17th of May, 1852. The analysis of
               these ordinances has shown that they imposed taxes on all landed estates, collectable one-sixth
               each year, through six years, 1853, 1854, 1855, 1856, 1857 and 1858. The repeal of the ordinances,
               then, abolished the whole tax—the one-sixth payable in 1853, as well as the five-sixths payable in
               the five subsequent years. The injunction to repeal is entire—reserves no portion of the taxes.
               Under these circumstances, the proviso is simply unmeaning. *Buchanan*, J., dissenting.

APPEAL from the Sixth District Court of New Orleans, *Cotton*, J.
*Labatt & Eustis, Jr.*, and *Randell Hunt*, for plaintiffs and appellants.
*Graihle*, for defendant.

Ogden, J. The first question presented in this case is, whether the city can maintain an action to recover the tax imposed by its ordinance on the owners of real estate, to meet their subscriptions to the stock of the two railroad companies, known as the New Orleans, Jackson and Great Northern, and the New Orleans, Opelousas and Great Western Railroad Companies. That question was not raised in the case of the *Police Jury* v. *John McDonogh's Succession*, in which this court affirmed the constitutionality of the Act of the Legislature of the 12th of March, 1852, under the authority of which the ordinance providing for the subscription by the city to the stock of these companies was passed; but we can see no reason to doubt the right of the city, to prosecute the delinquent tax payers under that ordinance. The subscription to the stock of those institutions has created a debt which the city is bound to discharge, and the means of discharging it has been granted by the law, which authorizes the city to levy a tax, for that purpose, on the owners of real estate within its limits. The collection of the tax by resort to legal process is necessarily embraced within the powers conferred, of making the subscription, and of imposing the tax to meet it.

The second question involved in this appeal, is precisely the one decided by

this court, in the case referred to of the *Police Jury* v. *McDonogh's Succession*, 8th Ann., to wit, the constitutionality of the Act of the Legislature authorizing the subscription. We had occasion, when the question was then presented, to examine the subject fully, and had the aid of all the light which could be thrown on it by the able discussions the subject has elicited, both in our own and in our sister States, and we came to the conclusion that there was no ground on which we could feel ourselves authorized to declare the Act of the Legislature unconstitutional. The court below has affirmed the verdict of a jury in the present case, which in opposition to the opinion expressed by this court, declares that the Legislature, in passing the act authorizing the subscriptions, have transcended their powers, and it again becomes our duty, on the appeal taken by the city, to pass on the same question between other parties.

The opinion in the former case was prepared with much care by the member of this court who then acted as its organ, and the conclusion to which the court came is, we think, supported by sound reason and high authority. . The question being one which had undergone judicial investigation in other States of the Union, the decisions of the highest courts in those States were referred to in support of the opinion then pronounced. Some of the principles then settled by this court, are recognized in other decisions of our sister States, not then referred to. See cases of *Slack*, &c. v. *Maysville and Lexington Railroad Company*, B. Monroe's Ky. R., vol. 13, p. 1. *Justices of Clarke Cy.* v. *The P. W. and K. R. Turnpike Company*, 11 do. B. Monroe, 143.

On the review of that opinion, we still adhere to its correctness. In that case, it was held by us:

1st. That the restriction imposed by Articles 108 and 109 of the Constitution of 1852, upon the aid to be given by the State to corporations for internal improvements, did not limit the aid which the parish and municipal corporations of the State might grant for such purposes.

2d. That the provision in the Act of the Legislature of 1852, referring it to the voters on whose property the tax was to be levied, to decide whether the ordinances imposing the tax should take effect, did not conflict with the letter or the spirit of the Constitution.

3d. That the burden imposed by that act on the owners of real estate, was a tax for local purposes, and that the duly constituted local authorities were the proper judges, to determine whether the public good within the limits of the local government, warranted the imposition of such tax.

4th. That the provisions by which the tax payers were constituted stockholders to the extent of the taxes paid by them, did not change the true nature of the law, as one imposing a tax for local purposes, and could not be considered as a grievance, but rather as a benefit to the tax payers.

We are satisfied that the principles thus declared, are conformable to reason and to the true and correct theory of our State Government. The taxing power for local purposes has always been exercised under legislative control by the subordinate local governments in the State; and under all the State Constitutions which have been adopted, the people have acquiesced in this, as one of the necessary means of carrying on the government, so that it has been the settled and uniform practice for the Legislature to delegate to the municipal governments presiding over the affairs of the cities, towns and parishes, throughout the State, all that portion of the legislative power which relates to taxation for local purposes. The power so delegated to the city of New Or-

leans, has been long exercised by its constituted local government without complaint, and under it, the commercial prosperity which the city enjoys, has been gradually increasing. The opposition which is made to the exercise of that power in the case of taxation for railroad purposes, is founded on some distinctive features of the law authorizing the imposition of taxes which have not existed in the prior legislation, and are supposed to conflict with the Constitution. Those features, distinguishing the present from former laws authorizing taxation for local purposes, are :

1st. That the agency of a private corporation is adopted for the purpose of effecting the object for which the taxes are imposed, and that the taxes, when collected, are paid over to those corporations who are bound, under their act of incorporation, to apply the money so paid, to the construction of the work or improvement in aid of which the tax is levied.

2d. That the ordinance of the municipal government imposing the tax, to be thus applied by a private corporation to the projected public improvement, is required to be approved by a majority of those on whom the tax is to fall, at an election to be held for that purpose, before the ordinance shall take effect.

Whether it has been wise and prudent in the legislative department of the government, to make these innovations in the laws heretofore regulating the subject of local taxation, it is not our province to decide. Under this new legislation, great abuses may spring up. In regard to the application of the money which the tax payers are required to contribute for such improvements, there may be stronger grounds of dissatisfaction and complaint, than those which have been heretofore so common, in relation to the disposition of the public funds, often lavishly squandered for useless or improper objects ; and it cannot be denied, that the test of a popular election, to ascertain the will of the majority of those by whom the tax is to be paid, is uncertain in its nature and liable to great corruption and abuse. But these objections furnish no ground for the interposition of the judiciary to arrest such a course of legislation, however disastrous the consequences with which it may be fraught. The only guide set before the judiciary in administering the laws which are made by an equal and coördinate department of the government, is the Constitution of the State, which both alike are sworn to support.

We find nothing in these new features, which have been introduced into the legislation of the State, that conflicts with either the Constitution of 1845, which existed when the statute was enacted, or with the present Constitution of 1852. Both Constitutions recognize the power of taxation, without any other qualification than that of equality and uniformity, from which it follows that the Legislature may delegate the power of taxation for corporate purposes, to the municipal governments of all the political subdivisions of the State, subject only to that qualification, and as each of these political divisions of government are formed on the basis of equal representation, the great principle of a republican government, that there shall be no taxation without representation, is fully carried out—the evils which, notwithstanding, still remain, are inseparable from such form of government—and the Constitution has no remedy against them. It is, therefore, no ground for our interference, that the taxes imposed and collected for the purpose of such improvement, may be misapplied or squandered by the private corporations who are selected as the agents to carry out the purposes of the municipal government in imposing the tax. .

The other objection founded on the reference of the ordinance imposing the tax, to the tax payers for their approval, was fully considered in the former opinion pronounced by us, on that subject, and there is no principle of the Constitution, which is violated by such legislation.   The Act of•the Legislature possesses the full vigor and effect of a law enacted with all the formalities prescribed by the Constitution ; it is a law not mandatary, but premissive in its character.   It was within the constitutional power of the Legislature, to have authorized the local government to levy a tax for any corporate purpose, absolutely and unconditionally.   They thought proper, however, to grant the permission on two conditions : 1st. That the representative local government should pass the ordinance.  2d. That a majority of the tax payers should approve it.

It has been long felt as a serious objection to the manner in which the municipal local governments are conducted, that those who do not own any real estate, and who pay no taxes, have as great a voice in passing laws imposing taxes on real estate, as the owners of real estate themselves, on whom alone the tax is to fall.   No constitutional objection, however, has been supposed to exist to this mode of levying taxes, and we can only see in that feature of the Act of the Legislature in question, a partial remedy for that evil which is founded in correct and just principles, and does not conflict with the letter or spirit of the Constitution.

Our views are fully expressed in the former case, as to the power of the municipal government to impose a tax for works of internal improvement not wholly within the limits of the local government, or of the State.   The termini of the two roads are within the limits of the city, and the tax is imposed for a corporate purpose.   To open new channels for the commerce of a city, when necessary to sustain it in the competition with other cities for its due share of commercial prosperity, falls within the legitimate objects of a government founded to protect its interests and advance its prosperity.   If the taxation for that purpose, which becomes necessary in the judgment of the representatives of the people who support such government, is equal and uniform, no principle of the Constitution is violated, however onerous the taxation may be.   The constitutionality of the measure is not affected by the great abuses which may result from the exercise of such a power, provided the object for which it is exercised, relates to the public welfare.

It remains to notice the special objection to the Act of the Legislature, which the Judge of the court below thought was a sufficient ground for declaring it to be unconstitutional.

The Constitution of 1845, which was in force when that Act was passed, contained a provision, that the State should not become subscriber to the stock of any corporation or joint stock company.   It was the opinion of the Judge of the court below, that this inhibition extended to the municipal corporations of the State.   The Article of the Constitution in its tenor, only applies to the State in its corporate capacity, and we do not think we would be authorized to extend it to the corporations which the Constitution authorizes the Legislature to create for political or municipal purposes, unless such inhibition is necessarily implied ; and in order that it be necessarily implied, we must be of the opinion that the reason for the inhibition in regard to the State becoming subscriber to the stock of a corporation or joint stock company, applies with precisely the same force to the political and municipal corporations which it was

contemplated would be created by the Legislature, and that it is impossible to suppose the one was intended without the other. We think, on the contrary, that the framers of the Constitution might well have thought it proper to prevent the State from incurring a debt or from employing its means, in taking stock in such companies, while they were willing that the parishes, towns and cities, enjoying a distinct municipal government, supported by local taxation, should be left free to act in that respect as might best suit their interests. As the Constitution speaks of the State, which is a distinct corporate body, and of other corporate political bodies to be created, and the inhibition is applied to the former and not to the latter, it would be the exercise of arbitrary power in us thus to extend this Article of the Constitution, by construction, beyond its letter.

After the most careful examination of the subject in all the various aspects in which it has presented itself to our minds, we conclude there is nothing which could authorize us to set aside the deliberately expressed will of the Legislature, on the ground that they have transcended their constitutional power. While this court, in the discharge of the duty confided to it of deciding in the last resort on the constitutionality of legislative acts, may be said to be clothed with a power higher than that of either the legislative or executive branches of the government, we cannot lose sight of the true nature of that high function which it was not intended should be arbitrarily exercised to correct the abuses of power by other departments of the government, against which the Constitution itself has furnished no security. We should be transcending the limits of our own constitutional duty, by declaring null and void an Act of the Legislature, except when a case presents itself, in which the clearest conviction is forced on our minds, that the Legislature have misunderstood the language of the Constitution and violated the letter or spirit of that instrument, and as such conviction has not been produced in regard to the law under consideration, it is our duty to uphold and enforce it.

The proviso in the Act of the Legislature of 1854, that the repeal of the city ordinances shall not have a retroactive effect, so as to relieve the city from the liability to collect and pay over to the railroad companies, that portion of the tax for the year 1853 not yet collected, we think meets the objection which exists in the mind of one of the members of the court, arising out of the passage of these acts, subsequent to the judgment rendered in this case.

The city ordinances, imposing a tax for 1853, have been partially carried into effect by the collection of the tax, and those ordinances were only repealed as to the taxes imposed for the subsequent years. The railroad companies will be bound to furnish certificates of stock, to all the delinquent tax payers, when they shall have complied with the law, and paid their taxes for the year 1853.

A judgment is asked for five per cent. on the whole amount of the taxes due by the defendant, as commissions of the City Assistant Attorney, directed to be paid by the defaulting tax payer, under the Act of the Legislature of 1853. It was made the duty of the Treasurer, by the Act passed on the 15th of April, 1853, to hand over all unpaid bills for taxes to the Assistant Attorney of the city, on the first Monday of May of each year; and it was made the duty of the Attorney to put them in suit immediately. The act further provides, that there shall be added to the amount of each bill, thus confided to the Attorney, a commission of five per cent. on the amount of the bill, to

be paid by the defaulting tax payer, and received by the Attorney in full compensation for his services. By a supplementary Act passed the 30th of April, the time of payment of the city taxes for the year 1853, was extended to the 1st of July, when the bills unpaid were to be handed over to the Attorney. There were separate bills made out against the defendant for her railroad taxes, and we are of opinion that the tender of payment of the two bills for the other taxes before they were confided to the Assistant Attorney for collection, relieves the defendant from the obligation of paying commissions on them, and also from interest.

It is therefore ordered and adjudged, that the judgment of the court below be reversed; and proceeding to give such judgment as in our opinion ought to have been given in the court below, it is further ordered, adjudged and decreed, that the plaintiff recover from the defendant, the sum of two thousand six hundred and sixty-four dollars sixty-two cents, with eight per cent. interest per annum, on the sum of eight hundred and forty-nine dollars and seventeen cents, from the 1st of July, 1853, and five per cent. commissions on the same amount, to wit, the sum of forty-two dollars forty-five cents, as commissions to be paid to the Assistant Attorney of the city, and that the defendant and appellee pay the costs in both courts.

SLIDELL, C. J. Some time since, we had occasion to consider the question of the constitutionality of the Act of 12th of March, 1852, entitled an Act providing for the subscription by the parishes and municipal corporations of the State, to the stock of corporations undertaking works of internal improvement, and for the payment and disposal of stock so subscribed. The subject was deemed of so much public importance, and so large a mass of the community was interested in the question, that the court invited argument from the profession generally, and without reference to a retainer in the particular case. The cause was ably argued, and after careful deliberation, resulted in an unanimous decision in favor of the constitutionality of the statute. Upon the faith of that decision we may reasonably presume that manifold contracts have been entered into and large advances of money made, the railroad enterprises then *initiated*, being of great magnitude. To overthrow the decision of a question of such moment would involve a responsibility most grave, and which a court of justice should not assume without the most clear and unqualified conviction, that its former conclusion was erroneous. A vaccillating jurisprudence is a grievous evil. It would be especially deplorable with regard to constitutional questions, embracing a wide practical range. *Misera est servitus ubi jus est vagum aut incertum.* So far from being satisfied that the former decisions was manifestly erroneous, a review of the subject leaves my opinion unchanged, and I am only induced to say anything now on the question, by deference to the views of one of my brethren.

Mr. Justice Buchanan considers the unconstitutionality of the statute deducible from the Article 121 of the Constitution of 1845, which Constitution was in force when the statute of March, 1852, was enacted, and which article declares that the State shall not become a subscriber to the stock of any corporation or joint stock company. My recollection is distinct, and I think the recollection of some of my brethren must be concurrent, that in our consultation before the preparation of the opinion in the case referred to, the spirit and effect of this article was considered, and our unanimous opinion was that the inhibition of the State did not imply a restraint of the legislative power to de-

NEW ORLEANS
*v.*
GRAILHE.

legate to municipal bodies authority to subscribe to such corporations. The reason the point was not expressly noticed in the opinion of the court, probably was, that it was virtually embraced in what was expressly said upon the kindred article of the Constitution of 1852. It had been argued for the defendant, that the Article 109 of the Constitution of 1852, limited the power of the Legislature, *i. e.* of the State, to a subscription within certain amounts for the stock of internal improvement companies; and it was said this restriction would be evaded by permitting the Legislature to confer on municipal corporations the power to tax the people for an unlimited amount. In answering this argument, the court observed: "It is true the Statute of 1852, imposes no limit of amount upon the subscription of municipal corporations; while the subsequently adopted Constitution of 1852, does limit the grant of State aid. But it is clear this difference involves no constitutional repugnancy; and on the score of policy and prudence, there was a reason for limiting the power of the Legislature, who were to impose a burden upon the entire population, for purposes which might result in unequal advantages to portions of its inhabitants; while in the matter of local taxation, there was a safeguard in a greater identy of interests, and in the control of the vote of the tax payer.'

This reasoning affords an equally conclusive answer to the argument deduced from the prohibition contained in the Article 121 of the Constitution of 1845. The two articles differ only in degree. The one prohibits any subscription at all to the stock of any corporation; the other prohibits subscription beyond a certain amount and a certain class of corporations. Both restrictions were dictated by the same consideration—the fear that the public treasury, which is supplied by the contributions of the proprietors of every section, might be unjustly used for purposes resulting in advantages to particular sections not equally shared by others; while in the matter of municipal taxation, operating only on small sections of the State, there was a safeguard in a greater identity of interest.

Upon the question of the legality of the tax as affected by the omission to furnish lists duly certified, I concur in the conclusion of Mr. Justice Ogden.

Upon the question of the repeal of the ordinance, supposing the question were properly before us, I have to say but a few words. I am not prepared to say that a person paying the tax, would be without right to receive stock. I think the conclusion of Mr. Justice Ogden, on that point, is correct.

If the repeal of the ordinance in anywise impairs any vested right of the tax payers, it is sufficient to say that such subsequent legislation, so far as it would tend to impair such vested right, would be constitutionally inoperative.

My only reason for alluding at all to points not presented by the record is, that they are noticed in the opinion of Mr. Justice Buchanan. I must not be considered, however, as recognizing the doctrine that this court can take judicial notice of municipal legislation. I think municipal ordinances should be pleaded and proved.

BUCHANAN, J., dissenting. The question presented by the pleadings in this case, is the constitutionality of the Act of the Legislature, approved 12th of March, 1852, entitled "an Act providing for subscription by the parishes and municipal corporatione of this State to the stock of corporations undertaking works of internal improvement, and for the payment and disposal of stock so subscribed."

This question was before the court in the June term, 1853, in the case of <span style="float:right">NEW ORLEANS<br>*v.*<br>GRAILHE.</span> the *Police Jury* v. *McDonogh's Executors*, and was in that case decided in favor of the constitutionality of the law in question. The great mass of authority which was brought to bear upon the subject, in decisions of the supreme tribunals of our sister States, collected in the very elaborate and learned opinion of the Chief Justice delivered in that case, induced my concurrence in the conclusions of that opinion. But I rejoice at the opportunity now afforded, of reconsidering the question, because much reflection on the subject has convinced me, that a contrary conclusion to that in the *McDonogh* case, necessarily follows from a provision of our own State Constitution, which of course could not have been considered in any of the decisions of the courts of other States.

I allude to Article 121 of the Constitution of 1845, the Constitution in force on the 12th of March, 1852. That Article is expressed in the following words: " The State shall not become subscriber to the stock of any corporation or joint stock company." I take this to be clearly a limitation or restriction of the legislative power; for a subscription by the State to stock, were it allowed, could only be made by a statute or Act of the Legislature. When, therefore, the Constitution said, " the State shall not become subscriber to the stock of any corporation or joint stock company," it was tantamount to saying, " the Legislature shall not pass any law authorizing a subscription by the State to the stock," &c.

As long as the Constitution of 1845 remained in force, the Article 121 of that instrument opposed an insuperable bar to any legislative enactment having for its object a subscription to stock. That which the Legislature was powerless to do itself, it has nevertheless authorized every police jury and every municipal corporation in the State to do, by this Statute of the 12th of March, 1852. And this authorization so given is, by its terms, unlimited—a general power of subscription to be exercised every where and at all times.

In considering the operation of this law, in relation to the Article 121 of the Constitution, we must first take into view the nature of a corporation. · It is a fictitious person, the creature of the law, deriving all its vitality from the law, and possessing no attributes or functions but those expressed in the law.

As regards municipal corporations, they are of the class denominated in the Civil Code *political*, which are defined (Art. 420) to be such " as have principally for their object, the administration of a portion of the State, and to which a part of the powers of government is delegated to that effect."

The municipal corporations of the State of Louisiana could have had, then, no power to subscribe for the stock of any other corporation or joint stock company, unless such power was given them by law. And this brings us to the inquiry—could the Legislature confer upon the municipal corporations a power which it did not itself possess? In matters of contract, and matters of inheritance, the maxim is, " *nemo ad alium plus juris transferre potest, quam ipse habeat.*" This rule seems to result from the necessity of things. No one can give more than he has. And if its soundness be admitted in the relations of men with each other, there seems a more peculiar propriety in its application to the operations of a constitutional government. As the municipal corporation is the creature of the Legislature, so is the Legislature, in its turn, nothing but the creature of the will of the people, as expressed in the Constitution. When that will has imposed a restriction upon the legislative action in any particular direction, the power to legislate in that direction not existing,

any attempted delegation to a corporation of a power of that nature, is a manifest evasion of the Constitution, and an usurpation of the most dangerous kind. The Constitution of the United States prohibits any State from passing a law impairing the obligation of a contract. Will any person pretend that the Legislature of Louisiana could authorize the corporation of New Orleans to pass an ordinance to annul and avoid one of its contracts? Yet this would be a legislative enactment of the same kind with that of the 12th of March, 1852. It will be objected, perhaps, that the Act of March 12th, 1852, does not authorize a subscription to stock in the name of the State. To this I answer, first, that the statute is general—applying to every police jury, and every municipal corporation in the State. Now, it is believed that every foot of ground in Louisiana, is within the territorial jurisdiction of some police jury, or some municipal corporation. Therefore, the statute has an operation coextensive with the State, and is in substance, though not in semblance, a statute to authorize the whole State to become subscriber to the stock of corporations. And, secondly, the violation of the Article 121 would not be less real, although it would not be so palpable, had the statute authorized but one subscription by one municipal corporation or police jury. The nullity, the radical vice, of want of authority in the party authorizing the subscription, would have equally existed in the case supposed.

I conclude that the Statute of the 12th of March, 1852, is void for unconstitutionality. I base my opinion upon the doctrine, that what a Legislature cannot constitutionally do itself, it cannot constitutionally authorize a municipal corporation of the State, its creature, to do. · And this doctrine is not at variance with any authority quoted in the decision of the case of the *Police Jury* v. *McDonogh's Executors.* It is not at variance with that decision itself, properly considered; for, singularly enough, the Article 121 of the Constitution of 1845, was not adverted to, either in the argument or in the decision of that case. The argument turned, indeed, in part upon the Article 108 of the Constitution of 1852, which is a modification of the 121st Article of that of 1845. But this argument was met, in the decision pronounced, by the very obvious response, that the Constitution of 1852 was not in force, when the Act was passed.

I now pass to the consideration of another matter, which, in my opinion, has taken away the right of action in this case, so far as the railroad taxes are concerned.

Two Acts of the Legislature were approved on the 15th of March, 1854, entitled respectively, "an Act providing for the subscription by the city of New Orleans to the stock of the New Orleans, Opelousas and Great Western Railroad Company"; and "an Act for the subscription by the city of New Orleans, to the stock of the New Orleans, Jackson, and Great Northern Railroad Company."

The date of the passage of these acts, which was subsequent to the judgment of the District Court rendered in this cause, sufficiently accounts for their not being noticed in the pleadings nor in the reasons for judgment. But if they shall appear, upon examination, to have materially modified the rights of · the parties litigant, we have the authority of Judge Martin for saying, that we are bound to notice a change in the law made since the rendition of the judgment in the court below. *Atchafalaya Bank* v. *Dawson*, 13 La. 510, 511.

The two statutes in question are in all respects literal copies of each other, with the exceptions which will be hereafter noticed. They authorize the com-

mon council of the city of New Orleans to subscribe to the stock of the Opelousas railroad, for one million and a half of dollars, and to the stock of the Jackson railroad, for two millions of dollars. They prescribe the clauses of the ordinances to be passed by the city council, for the subscriptions thus authorized. Those clauses are:

1st. A statement of the number and amount of the shares subscribed.

2d. The subscription to be made by the Mayor, and paid in city bonds, having twenty years to run, and bearing interest.

3d. A special tax on real estate and slaves, to be levied annually, for the payment of interest on the city bonds, &c.

4th. The bonds to be issued as called for by the railroad companies.

5th. The ordinances of the city council, approved May 13th and May 17th, 1852, providing for the subscription by the city, to the stock of the Jackson and Opelousas Railroads, (the ordinances under which the present suit is brought,) *to be repealed*—"provided," says each statute, "the repeal of said ordinance shall not be so construed as to relieve the city from the obligation to collect and pay over to said railroad company, that portion of the railroad tax imposed under said ordinance for the year 1853, which has not yet been collected and paid over to said company."

Subsequent sections in each statute provide, that the railroad companies shall receive, at par, the city bonds issued for the subscription to their stock; that the board of directors of each railroad company shall notify, in writing, to the Mayor, their acceptance of the city ordinance prescribed by the act; that upon such acceptance, the ordinance shall be submitted to the voters of the city, who have the right, under existing laws of voting at city elections, for approval and ratification, at an election to be held for that purpose, and shall only take effect after such approval by a majority of such voters; that bonds issued by the railroad companies, and secured by a pledge of the railroad tax for 1854, 1855, 1856, 1857, and 1858, levied under the ordinances (repealed) of 13th and 17th of May, 1852, shall be canceled by the company which issued the same, before the said company shall receive from the city any of the bonds authorized to be delivered for subscription to the stock of said company, by virtue of this act, &c.; and, lastly, that the city council shall elect annually, three directors in each of the railroad companies mentioned in the acts.

I assume as facts of public notoriety, that the city council of New Orleans have passed the ordinances required by the Acts of 15th of March, 1854, above mentioned; that said ordinances have been accepted by the Jackson and Opelousas Railroad Companies, for whose use and benefit the present suit is prosecuted in this court; that an election has been held, at which the said ordinances have been approved by a majority of the voters; and that the Mayor has subscribed in the name of the city for stock, and city bonds have been issued, for the amount of such subscription, according to those statutes and ordinances.

It is apparent, from a review of the legislation, that the subscriptions to railroad stock authorized by the two Acts of 1854, were intended to take the place of the subscriptions to the stock of the same companies, made by the city ordinances of the 13th and 17th of May, 1852. This fact clearly results from the obligation imposed by the Legislature upon the city corporation, of repealing the ordinances of 1852, simultaneously, and in the same ordinance,

with their subscriptions for precisely the same sum under the Act of 1854. It results with equal clearness from the requirement of the formal acceptance by the railroad companies, of the ordinance repealing the previous subscription, as a condition precedent to the validity of the subsequent subscription.

The city subscription of 1852, to the stock of the two railroads having, then, been superceded by subscriptions to a like amount in 1854, which last subscription is either paid or payable in city bonds, what is the position of the property holders, upon whom was assessed the payment of the first subscription? This question does not concern those who have paid their railroad tax of 1853. Probably they have got certificates from the railroad companies, as provided by the Act of 12th of March, 1852, section 4, for the amount of the tax by them paid, are satisfied with those certificates, and not inclined to insist upon their original right to acquire more certificates of railroad stock, by paying more annual installments of railroad tax. At all events, they are not before us. But the present defendant, who has never paid the tax, or any portion of the tax assessed to her under the ordinances of 1852—before condemning her to pay this claim, even-handed justice requires that we should examine whether *her* position has not been changed to her disadvantage, since this tax was levied, by the State and municipal legislation which we have been reviewing; and should such appear to be the case, I maintain that upon legal principle, she is released from her obligation to pay.

The defendant being a woman, did not vote at all upon the question of approving and ratifying the ordinances of May, 1852. Conceding, however, that she was bound by the vote of the majority of the holders of landed estate *who did vote*, the Act of 1852, and the city ordinances passed under it, in imposing an obligation upon her, conferred, at the same time, a valuable right—whatever she was to have paid, was so to be paid for her own individual benefit. The subscription was in name a subscription by the city of New Orleans—but, in reality, a subscription by the owners of landed estate in New Orleans; and the payment of the tax was a payment of that subscription, entitling the payer to a certificate of stock of like amount, transferable by delivery.

Such was the defendant's original position. But should payment now be enforced from her, she would pay without receiving any certificate—any equivalent. And why? Because the ordinances of 1852 have been repealed, which ordinances were her only title to such equivalent. It would be in vain to say, that the right to the certificate is expressed in the Act of the Legislature of the 12th of March, 1852. That act applied in terms to no particular case of subscription. It authorized, generally, subscriptions by police juries and municipal corporations. The corporation of New Orleans availed itself of that authorization, and passed the ordinances of the 13th and 17th of May, 1852—ordinances expressly referred to as the source of defendant's obligation upon the face of the bills, which supply the place of a petition in this record. The ordinances are repealed—not merely with the consent, but by the command of the Legislature—and the city has issued its bonds for the whole amount of its subscription, which bonds the railroads are obliged to take at par. Of course, those companies cannot give their certificates to individuals for stock for which the city has paid. Still less can they give them for stock which, by the repeal of the law creating it, has ceased to have any legal existence.

It has been repeatedly held by the Supreme Court, that if judgment be correctly given under a law which is repealed *pending the appeal,* the judgment must be reversed. 12 La. 547. 18 La. 497. 17 La. 478.

It is clear to my mind, that the defendant is released from the obligation of paying the railroad tax of 1853, by the repeal of the ordinance which imposed it, and by the substitution of a subscription in which she can claim no share, in the place of one in which she would have been entitled to a share proportionate to her payments.

This proposition would seem indeed unsusceptible of controversy, were it not for the proviso in the 5th paragraph of the 2d section of the Acts of 15th March, 1854, declaring that "the repeal of the said ordinances, (those of 13th and 17th of May, 1852,) shall not be so construed as to relieve the city from the liability to collect and pay over to said railroad companies, that portion of the railroad tax imposed under said ordinances for the year eighteen hundred and fifty-three, which has not yet been collected and paid over to said company."

This proviso immediately follows a peremptory requirement by the Legislature, of a repeal of the ordinances of the 13th and 17th of May, 1852. The analysis already made of those ordinances, has shown that they imposed taxes on all landed estate, in the one case, to the amount of two per cent., and in the other, to the amount of three per cent., collectable one-sixth each year, through six successive years—1853, 1854, 1855, 1856, 1857 and 1858. The repeal of the ordinances, then, abolished the whole tax—the one sixth payable in 1853, as well as the five-sixths payable in the five subsequent years. The injunction to repeal is entire—reserves no portion of the ordinances—no portion of the taxes. Under these circumstances, the proviso above quoted is simply unmeaning. What liability could there be on the part of the city to do a legal impossibility—to collect a tax which had been repealed? This proviso may be viewed as an instance of that careless legislation which too often disfigures the statute book.

I am of opinion that the judgment of the District Court should be affirmed.